Thank you, good morning, Your Honors, and may it please the Court, David Carpenter on behalf of Nutramax, I plan on addressing each of the independent issues on appeal, starting with the expert issue, then going on to the question of classified reliance. I'd like to reserve three minutes for a moment. Great, thank you. So, the first issue, we start with Oleon and the instruction that the plaintiffs must not merely plead, but actually prove the requirements of Rule 23 by a preponderance of the evidence. Here, plaintiffs alleged in their motion that they would present common evidence demonstrating a class-wide price premium, but at the Rule 23 stage, which was after the close of discovery, Dr. Dubé had merely outlined a proposed conjugant analysis. Their assertion was a mere allegation. He had not yet developed a model that could be sufficiently tested under the rigorous analysis or Rule 702. He had not drafted his survey questionnaire. He had not collected or confirmed he could collect the necessary data. He had not decided on critical assumptions required for his economic model, and having not actually performed the analysis, he had not shown that his model would actually produce representative, sensible outputs, much less results that were aligned with their class theory and capable, in fact, of establishing damages on a class-wide basis of trial. Now, are you saying that someone has to actually run their model before they can qualify under Rule 23, or are you saying that the model that he developed was not sufficiently precise that it could do the job? So, in part, it's both. First, there's a category of cases where you don't actually need to have the expert model at all to identify a basis for calculating damages. That would be like the Levia line of cases. That would be a class-action involving an unfair fee, where the- But I don't understand. Let's assume that, for the sake of argument, that his model survey would have been adequate and would have determined what damages, if any, were available, or do you see a requirement that he actually has to run it at presumably great expense before Rule 23 can be set up? So, there are three reasons why having the model run is relevant to the Rule 23 analysis. So, first, as Olean notes, seeing the outputs is part of the reliability, the robustness checks to see if the model is producing nonsensical or irrational results, to see if the results actually show that the model is working in implementation, which you can't see until it's run. The second reason is that the results could show variation among the class members, variation in demographics, variation over time, or, in this case, you could see a price premium associated with some of the challenge claims, but not the joint health supplement claim. And in that case, the model would not be capable of resolving all claims up or down. It would devolve into individual inquiries into which claims which people had seen. And you can see that also in Olean when it talks about the rigorous analysis required on page 683. It talks about you need to entertain the factual challenges and resolve factual disputes into the assumptions, inputs, and outputs. And you can't do that in a case like this, where the expert had not yet developed or specified his assumptions, inputs, or outputs. We can also look at the plain language of Rule 702, because here's what the district court did do. It said, Dube is a qualified expert, and conjoint analysis is generally a well-accepted methodology. If that were enough, then all you'd really need to do is ever, in these kinds of cases, say here's my expert, I can do a conjoint survey. But Olean requires more, and Rule 702 requires more. Rule 702 also requires that the expert testimony be based on sufficient facts or data, and that the expert has reliably applied the principles and methods to the facts. So that doesn't mean you need to complete your analysis. But I think it does require to do more than what Dube did here, which is to actually fully develop the assumptions and inputs enough that they can be tested and aligned to Rule 702. And I'm because I forgot, did you ask for a dabbered hearing in connection with the points you're making now? We filed a dabber motion, and it was ruled on on page 10 to 11 of the opinion. And you can see in there that the judge effectively addresses subsections A and C of Rule 702, but not B and D. And when the court applied that same principle later in the decision in the footnote on the merits of the class certification motion. And you're going to talk about the feasibility of running this survey. And in response to that, I'll have a few points. So first is the Supreme Court has long rejected the certify first, ask questions, and decertify later approach to Rule 23. The requirements of Rule 23 need to be met through evidentiary proof at the Rule 23 stage. And that makes particular sense here, where classification was done at the close of discovery. So there is plenty of time for them to conduct the survey. And in fact, courts do that all the time. Experts actually do run these models frequently for the Rule 23 stage. The trick is that sometimes when they do that, the implementation shows errors or flaws that cause the model to be rejected and classification to be denied, as it was in the Myer v. CDS case. You shouldn't be able to avoid that scrutiny simply by not developing and conducting analysis in the first place, because you create a situation where you're actually encouraging people to do nothing other than, say, hedonic regression or conjoint analysis. So in this may be far-field from anything you or your adversary considered, but there are a lot of cases throughout the United States Circuit, federal cases, saying that in a mass tort action, you don't actually have to carry out an epidemiological study as long as you could design one and have design one that, if carried out, would satisfy Rule 23. And the reason for that is because it costs about a million dollars or more to do an epidemiological study. So you're putting the plaintiff in a class action to the position, if you require the epidemiological study, to fork out a huge amount of money before they even know whether the class is going to be certified or not. So I wonder whether that analogy, and I apologize for this out of unusual analogy, but I wonder if that's not true here. How much, do we have any information about how much it would have cost to run his study? I don't have that on hand. I assume it would cost a few hundred thousand dollars. But they need to run it anyway, eventually, to get to trial, right? And the Supreme Court has said in. Classification is not the trial. There are lots of things. For example, you can consider evidence at a Rule 23 hearing that ultimately is determined to be inadmissible. Well, although, it only makes it clear that ultimately the Rule 23 showing needs to be based on evidence that would be admissible. That is part of it. It cites Tyson for that on page 665 and also repeats that on 678 of the decision. But let me approach it from this angle. Comcast talks about why or how the class action device is an exception to the usual rule that you proceed individually. So here, what plaintiffs are saying is for their individual claims, they have a whole other separate form of injury. Namely, they testify, I wouldn't have bought the product if it didn't work for me. That's their form of injury for a normal individual claim. They don't require an epidemiological study or anything. They don't require the price premium study. The price premiums model only comes in as a substitute for the usual form of individual testimony that would be necessary to proceed on a class-wide basis. And in that context, to justify invoking the class action device as an exception, I submit that you should be required to actually show that the common proof you're going to rely on exists or will be available at trial, not merely that it could be developed in the future. And at a minimum, at least more narrowly, you need to do more than what Dr. Dubé did here. You need to provide more detail about the model so that it can be subjected to that rigorous analysis and the plain language of Rule 702. I'll move on very quickly to the second issue, which is that the court clearly erred in its articulation of the legal standards surrounding the question of class-wide reliance. And because of that error, it ignored critical evidence undermining classification. The underlying substantive California law is not in dispute. California law for the CLRA requires actual reliance as an element of the claim. Now, materiality supports the inference of class-wide reliance, but that inference is rebuttable at the Rule 23 stage. And both the Ninth Circuit cases and underlying California cases are clear that if the evidence shows that reliance or materiality could vary from individuals, then class treatment is not proper. Here, the district court committed legal error, and you can see this analysis on page 26, and again page 30 in note 20 of its decision, where effectively said, well, this whole causation inquiry is an inherently common issue to be decided under the objective reasonable consumer standard. And that is wrong under California law. It's also wrong under Walmart Reduce, which makes it clear that the class action device cannot abrogate the underlying substantive law. You can't just simply wipe away an actual reliance requirement by replacing it with the hypothetical objective reasonable consumer. And based on that legal error, the court ignored evidence. So, again, looking a little bit far afield. So, in the federal law, you have, of course, the basic versus Levinson fraud on the market presumption, which can be rebutted at the, but still is a presumption that otherwise applies. Why shouldn't the California legislation be read as, in effect, saying, can we apply that same kind of policy to material misstatements? We presume that when there is a material misstatement that all the purchasers relied on it, that could be ultimately rebutted, but that is sufficient to get you class certification. So, that's not how, in fact, California works. You see in the Stearns decision that it actually found a variation in materiality or reliance at the class certification stage sufficient to defeat class treatment. You see in the California cases, the Vioxx case, Caro, Fairbanks, all of which treat variation in potential materiality or reliance on an individual basis as a basis for denying Rule 23. I think the difference there is because the basic presumption is, the court said in Hampton, is really the element of the claim itself, whereas here, the materiality is simply an inference to proceed on a class-wide basis. And the key, one of the key issues here is just the veterinarian recommendation, right? That you have declarations from one of plaintiff's own veterinarians about recommending these products, survey evidence saying that a majority or roughly 50% of consumers rely on their veterinarian recommendations and do so even before seeing the label. And that is the type of evidence that reflects the inference here. Thank you, Your Honor. We'll give you your three minutes, Robert. Okay. Thank you. May it please the Court. My name is Mark Sigmund and I represent the plaintiffs and the class members here. Your Honors, before this morning, I was going to say that I felt this entire appeal was largely a bait and switch because in their 23th petition, they clearly asked for a bright-line rule that an analysis like a conjoint has to be performed before a class cert. They argued that in their opening brief. We explained in our response brief that's just not the law. Then in the reply brief, they very much backed off that and they said, well, we're not asking for a bright-line rule. But now again, this morning, I'm hearing it seems like that they're asking, they are asking for a bright-line rule, at least for a conjoint or any analysis that's like a conjoint. I want to be clear, there is no such bright-line rule about that. We explained that in the O'Lean case and Comcast. Every decision is a bright-line rule. I'm just assuming that's right. You would still have to show that the model that you proposed to use would be sufficiently good that it would identify the damages for the class, et cetera. And so, the, and they're saying, no, it's not that good, it leaves, it's too many holes or too many uncertainties, there's too many possibilities and it won't do that job. What about that? So, I completely agree that you can't just point at a model and you have to do a lot more than that. Two points I want to make, number one, this is important. Once you get past the bright-line rule issue, you're out of de novo land and now you're in abuse of discretion land. And so, you know, I really think that Nutramax in arguing for the bright-line rule and also I'll get to this materiality, they've argued legal error both times to try to smuggle in de novo review for what is not de novo review. This is abuse of discretion on both issues. So, to your question, your honor, yes, you cannot just faint at a model, you have to do more. And we, but we outlined in a brief everything that here that Dr. Dubay-Dagy identified the target population based on research. He worked with an economics firm to purchase data. He considered price data to determine what the relevant market was. He testified that he designed the actual survey. He specified which product features he would test, which claims and issue he would test, which brands he would test, which competing brands he was looking at, the package sizes, the product types. He did a lot. And if your honor could see his bills, I think your honor would agree with that. He did much more than just faint at what his analysis would be. And so, under abuse of discretion, I just did not see at all on this record how you can find that, especially after the district court in a 36-page detailed opinion outlined exactly all these factors it looked at. This is not a case where the expert simply said, you know what, I'll do a conjoint. Dr. Dubay did a lot more here. The district court recognized that. The district court balanced all these factors. It addressed all their complaints against this. And so, something else, too, that the opposing counsel mentioned is that they said, well, we can't attack this survey until it's been completed. And they even filed a supplemental response letter talking about one attack they can make, what's called the supply side attack. And they talk about how maybe Dr. Dubay's model fails for failing to account for supply side factors, but their expert already attacked the model on that basis. Because Dr. Dubay sufficiently designed it, he designed it well enough that their expert could say, as designed, that model's going to fail. And the district court here rejected that. It mentioned the supply side issue in its order. They also mentioned in their brief something called focalism bias. Well, guess what? Their expert and their counter-expert looked at this model as designed, as sufficiently designed, and said that suffers from focalism bias. And so, even the attacks that they're mentioning that they want to make, they've already made them, and they failed. You know, Your Honor, I'm not sure what else I can say. I mean, the Comcast case simply does not require that the analysis be done beforehand, like Your Honor mentioned, in Mass Tort's case. It's the same thing. The actual word is capable of showing damages, not actually showing damages. All the district courts in this circuit recognize that, and they apply that. I cited another one in my supplemental authorities letter. If this court were to hold otherwise, it would be a radical C change in class action procedure in this circuit. And every district court would have to sort of change everything that it's doing here. There's two other points that Mr. Max made in his reply brief that I want to address briefly. I don't think either one matters. I don't think it's going to affect the analysis here. But I did want to mention that just because I have not had a chance to respond to that, and it's only in the reply brief. First, and they did mention a little bit today. First, they note that if the conjoint comes back and shows no damages whatsoever from the class, they acknowledge that that is a class-wide result. And they ought to be happy with that, frankly, because that's going to, you know, basically end the case. But they point out in their reply brief that, well, there might be a couple other things to be done. And so I want to address that. So like all plaintiffs, our complaint was very, very broad. It alleged lots of theories. It alleged not just the label claims, but also claims made in advertising and social media. But like every good plaintiff, as the case progressed, we narrowed our theories to our strongest theories and our strongest facts, as every judge wants you to do. And so at Class Cert, we focused on the labels, and that was what Class Cert was based on. And so, and that's the class that's certified. If the conjoint comes back and shows no damages whatsoever, then, you know, that's no good for us, but great for them. That's the result. Now, technically, that's why also your case is very different from Comcast, because there the expert retained all four theories, even though three of them had been held legally impossible, or legally defective. And so the Supreme Court said, well, how can we put any reliance on the expert when three of the four theories have now been tossed out? But you narrowed it down to one theory. Exactly. And Comcast is like Conagra, where there was 100% natural in all of GMO, and the claim was 100% natural, but the analysis was non-GMO, and the court said, that's just, it doesn't match, right? And that was the Comcast problem. Your Honor recognizes, we don't have that problem here. And so what will happen if that's the result? You know what, like, so what would happen at that point? Well, at that point, I mean, presumably the plaintiffs would drop the remaining claims that we didn't even move for Class Certification for, or perhaps Newterm actually moved for summary judgment on those remaining claims, or perhaps the district court would, you know, decertify the class, and those, you know, remaining claims would exist. But it doesn't make any sense for a defendant to try to punish a plaintiff for narrowing its claims, and its theory is, as the case goes on, narrowing it for purposes of Class Certification, getting a class result that winds the class, and then saying, ah, you can't certify that class, because after the most important part of the case was disposed of, there's these little ancillary issues out there, too, and that somehow prevents Class Cert, or is a reason to reverse Class Cert here. That whole thing is just a red herring. Second, there's another red herring out there. In its reply brief, Newtermax says that what the conjoint here is going to do is look at the products as they exist over here, and compare it to the competing products, and then it says, but look, the claims at issue are actually very similar between Cosequin and the competing products, so probably, why would there be any difference, any actual damages here? That is not what the conjoint is doing in this case. It's very clear. The conjoint is holding up the products as labeled here, and then it will strip off some of the claims one at a time over here, and we'll figure out whether the public values those claims, and how much those claims are valued for. Those damages exist here, even if there are no competitors at all. Those damages would exist here, even if the competitors had an identical label. In that situation, I mean, what I'll do is just go up and sue the competitor, too, because they're both harming the public in the same amount. So, the idea that that's what we're looking at is just not true. The conjoint analysis does mention the competitors. It mentions them for purposes of establishing what the relevant market is, and the competitors will be mentioned, and the actual questions to the participants. That is not what the study is going to mention, and it gets hyper technical, because there's two types of damages. There's willingness to pay, and then price premium. Those are actually different measures of damages, slightly. Intermax conflates those in a supply brief, but if you want to look closely at the report, you'll see what I'm talking about there. That's all I have to say on the class cert issue, on that issue, unless the court has anything else it wants to hear about. On the inference of reliance issue, what the district court did in this case is exactly what every district court does when applying the inference in California. Intermax is, again, trying to smuggle in this de novo standard of review here by claiming some sort of legal error. I have read their brief, both briefs, so many times to try to figure out exactly what it is that this legal error supposedly is, and I don't get it, because the court cited the exact cases that they rely on, Vioxx and Stearns, which are the ones that acknowledge that it's a rebuttable inference, if the court cited those. It then talks about how it's an inference, and then it actually analyzed all of the evidence that they now say is the rebuttal evidence, and so even if the court somehow, somehow, and it did not, but even if it misstated the law, it would be a harmless error, because the court actually analyzed the evidence that Intermax is now saying is the rebuttal evidence. All these factors, the fact that that's recommended depends on experiences, Dr. Scott, and so, you just, you know, there simply is no error here. The court never held that the inference was dispositive, and so, yeah, so there's no legal error, and there's no error in how the court actually applied it here. If the court were to reverse on this case, I mean, I'm not sure how it could without basically reversing on every other California case that relied on the inference here, and then actually analyze the rebuttal evidence. Final point is the, you know, the court here in certifying the class of materiality did not look only at the inference. That was only one factor among many, but that's the only one that Intermax addresses on appeal. The district court also looked at the expert testimony from Dr. Silverman, who is our expert, who, through his studies, and his surveys, and his interviews, testified that reasonable consumers would find these claims to be material. It relied on Nutramax's field market research, and it relied on Dr. Scott's own testimony, and so those are other pieces of evidence that the court relied on to establish materiality in addition to the bare inference based on, because the inference is just basically based on what the label claims mean to a reasonable person. So, if you look at all of that, and again, Nutramax doesn't even address those later factors. I don't see how the court could reverse on that. Again, this is abuse of discretion, not de novo. Both issues are abuse of discretion. There was none here. I'm happy to answer any other questions. Otherwise, I'm also happy to sit down. Thank you very much. Thank you. Okay, you have three minutes. Thank you. Thank you, Renner. Let's make a few points. So, at the outset, the district court did not actually resolve any of the factual disputes. It really only relied on the fact that Dubay is qualified and that the conjoint analysis generally is accepted. It then kind of nodded to the fact that Dubay said he will account for supply-side factors, but it didn't engage with Toupia's criticisms, and there were no specifications of the assumptions to check whether or not that allegation, when Dubay says, I'll account for supply-side factors, will actually bear out in practice. And that's part of the main problem here. There is, they say that this is different from Comcast because Dubay said he will tease out the differences. Again, though, that's an allegation. They have not shown that, in fact, to be the case because Dubay's model is not sufficiently developed to determine whether he will actually be able to do that. They also rely on the idea of the lie from Comcast about being capable, but capable can't merely mean capable in theory. Because if that were the case, it really would reduce Comcast to functional covalent full pleading standard, where all you need to do is hire a competent expert to do some preliminary analysis and say conjoint analysis capable. And I can talk about the issues more because Dr. Dubay, he did not do some preliminary analysis. We acknowledge that, but it didn't actually hit the major functions that are necessary to test the reliability of the model. So, he didn't actually design the survey questions to get a sense of how the survey would operate. Just so I understand your legal position here. Yes. So, let's say a judge gets a challenge to an expert on a Rule 23 certification hearing and is presented with all the relevant factors from both sides and reaches a conclusion, but doesn't in his or her conclusion specify exactly why he accepted or rejected each of the specific objections. Can you say that that is reversible on appeal, even though the standard is abuse of discretion? No, not necessarily. It doesn't mean that you have to enumerate every finding. But here, there were actually the data to assess whether focalism was or was not present in the survey because the survey hadn't been designed, right? There wasn't data to assess whether the model was or was not accounting for supply-side factors because, again, the model wasn't built out. So, the district court wasn't actually making findings. He was just acknowledging that that's what Dr. Dubay says he intends to do, and that can't be sufficient as evidentiary proof by a ponderance of the evidence of the Rule 23 statute. Thank you, sir. We thank both counsel for their arguments this morning. This case is now submitted, and the court stands on recess until tomorrow. Thank you. Thank you. All rise. This court for this session stands adjourned.
judges: TASHIMA, THOMAS, Rakoff